IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROY G. PADILLA,

               Plaintiff,

v.                                              CIV 12-0484 KBM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

               Defendant.

# MEMORANDUM OPINION & ORDER

Plaintiff moves to reverse and remand the Administration's denial of benefits.  *See Doc. 19.*  After full briefing, the sole ground for relief is whether Administrative Law Judge ("ALJ") Ann Farris erred in her Step 4 RFC finding that Plaintiff's mental condition limits him to simple and routine tasks at a non-production pace.  *See Doc. 19* at 6-8; *Doc. 22* at 2.  The Appeals Council denied a request for review, and this appeal followed.  *See Record* at 1.[1]  Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.  *See Docs. 7, 8.*

The general inquiry is whether ALJ Farris applied the correct legal standards, and whether her decision is supported by substantial evidence.  A deficiency in either area is grounds for remand.  *See, e.g., Keyes-Zachary v. Astrue,* 695 F. 3d 1156, 1161 (10th Cir. 2012); *Wilson v. Astrue,* 602 F.3d 1136, 1140 (10th Cir. 2010); *Hackett v. Barnhart,* 395 F.3d 1168, 1172

---

[1]  Documents 13-1 through 13-10 and 14-1 through 14-5 comprise the sealed Administrative Record ("Record").  The Court cites the Record's internal pagination, rather than the CM/ECF document number and page.  ALJ Farris' decision appears at pages 10 through 21.

(10th Cir. 2005); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004).  Having carefully

reviewed the portions of the Record relating to psychological treatment and evaluation, and the

parties' positions, the Court denies the motion and dismisses this action.

## Factual Background

Plaintiff periodically has been imprisoned, homeless, and abused drugs and alcohol.  *See,*

*e.g., Doc. 19* at 3; *Record* at 12, 16, 17.  His primary physical impairment is the heart attack in

2008, resulting in implantation of a defibrillator.  *See Doc. 19* at 3; *Record* at 329.  As for his

mental impairments, the ALJ found that Plaintiff's "severe impairments" include "borderline

intellectual functioning . . . major depressive disorder, post-traumatic stress disorder, and

anxiety."  *Record* at 12.

Consultative psychologist Dr. Eligio R. Padilla, who is not related to Plaintiff, examined

Plaintiff and administered a number of tests.  On The WAIS-IV test, Plaintiff scored "low

average" in verbal comprehension, perceptional reasoning, working memory, processing speed,

and general ability.  Plaintiff's "full scale" WAIS-IV score was 70, which placed him in the 8th

percentile and "borderline" category.  *See id.* at 328, 330, 331.  Among other things, Dr. Padilla

interpreted the results to mean Plaintiff "is likely to experience difficulty keeping up with his

peers in a wide variety of situations that require thinking and reasoning abilities," *id.* at 331, and

that Plaintiff's "ability in processing simple or routine visual material without making errors in

the low average range when compared to his peers," *id.* at 332.  Dr. Padilla assessed Plaintiff

with a current GAF of 50, and noted that his "prognosis" for Plaintiff "would [have been] poor

were it not for the involvement and support of his case manager and of the medical and mental

health professionals at the University of New Mexico."  *Id.* at 333.

In terms of functionality, Dr. Padilla translated his test results to: "marked" limitations in Plaintiff's ability to understand detailed or complex instructions, ability to carry out instructions, and ability to adapt to changes in the workplace; ***"moderate" limitations in Plaintiff's ability to "attend and concentrate,"*** interact with the public, and interact with coworkers; ***"mild" limitations in Plaintiff's ability to understand "[v]ery short and simple instructions,"*** interact with supervisors, recognize and appropriately respond to hazards, and travel; and no limitations in Plaintiff's ability to "manage his simple financial affairs."  *Id.* at 333-35 (emphasis added).

The nonexamining agency reviewer, Carol Mohney, Ph.D., presumably also a psychologist, reviewed Dr. Padilla's report and generally agreed with him.  *See id.* at 354-55. For example, Dr. Mohney's Mental Residual Functional Capacity Assessment (Exhibit 8F) considered Plaintiff "***not significantly limited" in areas that involved "short and simple instructions,"*** or the "ability to make simple work-related decisions," or the ability to "ask simple questions or request assistance."  *Id.* at 352-53 (emphasis added).  Dr. Mohney considered Plaintiff ***"moderately limited"*** in areas such as Plaintiff's ability to understand, remember, and carry out "detailed instructions," ***maintain "attention and concentration for extended periods,"*** and maintain an "ordinary routine without special supervision."  *Id.* at 252 (emphasis added).  Dr. Mohney's Psychiatric Review Technique (Exhibit 9F) also reflected her opinion that Plaintiff had "moderate" limitations in maintaining "concentration, persistence, or pace."  *Id.* at 366.

Plaintiff's "community support worker" or case manager, Martha Beltramo, testified at the hearing.  *See id.* at 49.  She was of the opinion that Plaintiff's psychiatric problems posed barriers to his ability to work:

> he does not – he doesn't follow – he doesn't track as well as
> someone who probably hasn't had [a heart attack].   So, for
> example, when I last met with him [to conduct a survey] I had to
> prompt him on, you know, you want to fill in, you know, just
> trying to fill in the circle and he checked it and then no, you can't
> check it, you have to fill it in . . .   Just things like that and to
> continue to remind him . . . it was like pretty repetitious on my part
> to keep him on track.

*Id.* at 51-52.

ALJ Farris's RFC determination included three mental capacity-related limitations – "the claimant is limited to simple, routine asks; only have occasional interaction with the public; and ***should not be required to work at a production rate pace.***"  *Id.* at 14 (emphasis added).  In making that conclusion, she fully discussed Dr. Padilla's report and opinions, but gave them "little weight."  *Id.* at 18; *see also id.* at 16.  ALJ Farris also "considered Ms. Beltramo's testimony" but found that it "does not seem to limit the cclaimant for performing simple, light work activity" and concurred with Dr. Mohney's opinion that Plaintiff could "perform simple, unskilled work."  *See id.* at 18.

From the context of her opinion, the ALJ based her conclusion largely on mental health records, most of which occurred after Dr. Padilla examined Plaintiff, and Plaintiff's own testimony and report of his functional capacity.  Her reasoning includes the following observations:

> [three days after Dr. Padilla's examination, Plaintiff] was no
> longer homeless and felt like a real person again.  He was going to
> [AA/NA] meetings and trying to keep his appointments.   He
> reported that he still has daily flashbacks but nightmares were
> happening only once a week.  He also reported some phobic
> avoidance where he could not watch TV shows, which reminded
> him of his trauma.  He was taking Fluoxetine 80 mg.  On mental
> status exam, his mood was "happy" and affect was euthymic.
> Insight and judgment were fair (Exhibit 7F/10, 13-14).  On August

11, 2010, he noted that he had a good time in cooking class and interacted with other members of PSR (Exhibit 7F/11).[2]

Mental status examination on November 16, 2010 revealed the claimant appeared anxious overall, with some mild psychomotor agitation. He was alert and oriented times three. His mood was "scared" and observed mood was anxious. His affect was fearful, apprehensive, congruent with observed mood. His thought process was organized and goal oriented. He had no suicidal or homicidal ideation. The claimant denied auditory or visual hallucinations and there was no evidence for delusions. He was started on Prazosin to help reduce his overall anxiety. He was rated with a GAF of 42 (new records, page 20).

Further records indicate the claimant was interested in starting the PSR . . . again. He remained sober and continued to attend an AA/NA groups at the Endorphin Power Company. He admitted to recent increase in his isolation. He remained concern (sic) about his physical health and was doing all he could to stay healthy, as he was fearful of a fourth heart attack. Treatment notes dated February 22, 2011 revealed the claimant was off his Prazosin for a month. He was doing many productive activities. He went to cocaine and alcohol dependence meetings as well as 12-step meetings; PTSD meetings once a week; PSR 2-3 times a week; and was working with this case manager (new records, page 23). On May 10, 2011, the claimant reported anxiety, flashbacks, and nightmares, but it was tolerable. He indicated that he had become extremely dizzy and discontinued Prazosin. However, after his self-continued, his nightmares resumed; thus it was effective. Overall, he was doing quite well (new records, page 27). On October 13, 2011, treatment notes revealed the claimant was serving dinner at Good Sheppard (sic) and was going to PSR. He had lost 10 pounds and felt good. He was sleeping seven hours a night, and his appetite was good (16F, page 37).

\* \* \* \* \*

I have also considered the claimant's activities of daily living. In a Function Report, the claimant notes that he has no problems with personal care. He takes public transportation, walks, shops, talks on the telephone, does the laundry, attends church and PSR, reads, and goes to the library. He enjoys arts and crafts, baking, cooking,

---

[2]  PSR means "psycho social rehabilitation" services provided by the University of New Mexico outpatient psychiatric center.  *See Record* at 17, 38, 49.

and likes to go to the movies (Exhibit 1E). At the hearing, he
testified that he lives alone. He uses the microwave and friend
(sic) sometimes cooks for him. His friend takes him grocery
shopping, [and Claimant] does the laundry, vacuums, reads
mystery novels, and watches television. He likes PSR group as
they do ceramics, sewing, and go to outings. He attends church
every other Sunday, and takes public transportation.

. . . Although the claimant has received various forms of mental
health treatment for his allegedly disabling symptoms, which
would normally weigh somewhat in the claimant's favor, the
record also reveals that the treatment has been generally successful
in controlling the symptoms. In fact, he testified that without the
PSR, he would not be going out. Moreover, he is not been
psychiatrically hospitalized as a result of his mental condition.

\* \* \* \* \*

After considering the evidence as a whole, I conclude that the
claimant retains the residual functional capacity, despite his
impairments, to perform light work . . .   In addition, the claimant
is limited to simple, routine tasks; with only occasional interaction
with the public; *and should not be required to work at a
production rate pace.* The assessment of the claimant's residual
functional capacity is supported by the overall medical evidence
and allows for many of his subjective complaints and limitations.

*Id.* at 16-19 (emphasis added).

In her hypothetical questions to the vocational expert, ALJ Farris repeated her RFC

finding. *See id.* at 54.   She did not specifically pose a "moderate" limitation in concentration,

persistence or pace to him. *See id.* at 54-55.   Plaintiff's non-attorney representative (denoted

"ATTY" in the hearing transcript) began to question the VE about how an inability to "sustain

concentration, persistence and pace for longer than a two hour period of time" would impact his

opinions. However, she abandoned that specific line of questioning:

[ATTY:]   Again, just back to the routine question if the
person couldn't sustain an eight[-]hour day, 40[-]hour work week,
would he be able to do these jobs?

[VE:]  No.

ATTY:   And if he was not able to sustain persistence – concentration, persistence and pace, if he had a limitation, would he be able to do these jobs?

ALJ:  You're going to have to define that a little bit better.

ATTY:  Okay.

ALJ:  Frequently, constantly, occasionally.

ATTY:  Okay.

ALJ:  Two hour periods or you know –

ATTY:  If he couldn't –

ALJ:  – whether we tell you that –

ATTY:   – sustain concentration, persistence and pace for longer than a two[-]hour period of time, would he be able to do these jobs?

[VE:]  Two hours when you have – you start, you have a two hour break, you have a two hours you work for lunch, then you work for two hours until the –

[ATTY:]  I don't think that's what I mean.  I'm just – I really am having trouble with the hypothetical's today and I apologize.  I don't usually struggle so.   I can't do it.  I can't ask the question.  Another question about the jobs because I'm not familiar with them . . . .

*Id.* at 58-59.  The hearing did, however, conclude by exploring the ALJ's "no production pace"

requirement with the VE:

ATTY:   And are [convex grinder and motor polarizer] production types of jobs?

VE:  Production in what sense?

ALJ:  Well, I said no production pace.  So they –

VE:  Well –

ALJ:  – can't be too –

VE:  I mean, they're in an industrial setting is that what you mean?

ATTY:  I'm asking if they're in an industrial setting and she says no production work pace, would he be having to work at a production pace?   Would he be having to polarize or grind at a certain pace?  At a production pace and I'm not real sure what a production pace entails.

ALJ:   All right.   Well, what I generally mean by a production pace is some sort of assembly line worker where someone's waiting for him to be done with his –

VE:  Yeah.

ALJ:  – work and can't do their work until he's done with theirs and –

VE:  That's –

\* \* \* \* \*

ALJ:  Do these jobs have maybe quotas, but you have to be done by the end of the day –

VE:  The end of the day –

ALJ:  – or something like that?

VE:   – and it's not like you say like in an assembly line, Joe does his piece, Frank does his piece and Frank can't do his piece until Joe is done.

ALJ:  Okay.

VE:  Was that too –

ALJ:  It's not like that?

VE:  It's not like that.

-8-

* * * * *

ATTY:  Okay.  I have no other questions.

*Id.* at 61-63.

## Analysis

As an initial matter, Plaintiff has withdrawn his Step 5 argument regarding Plaintiff's "full scale IQ score . . . at pages 8-9" which was based on "*Frazee v. Barnhart,* 259 F. Supp. 2d 1182 (D. Kan. 2003)." *Doc. 22* at 1.  However, Plaintiff cited also *Frazee* in a Step 4 context on page 8.  *See Doc. 19* at 8.  There, Plaintiff argued that the ALJ  erred by failing to include the "full scale IQ of 79, which is borderline intellectual functioning, in her RFC finding.  *Frazee v. Barnhart,* 259 F. Supp. 2d 1182 (D. Kan. 2003)." *Doc. 19* at 8.  Nevertheless, since the *Frazee* case itself only involved Step 5 considerations, and not a Step 4 analysis, the Court believes Plaintiff's waiver encompasses quoted assertion of error.  See *Frazee,* 259 F. Supp. 2d at 1196, 1200.

If this interpretation is incorrect, then the Court further notes that the Commissioner argues borderline intellectual functioning is simply a diagnosis, rather than an assessment of Plaintiff's specific limitations, and the ALJ considered all of Plaintiff's mental impairments in determining his limitations.  *See Doc. 20* at 5.  Plaintiff does not take issue with this correct statement of the law or with the fact that ALJ Farris considered his mental limitations, including borderline intellectual functioning, during the course of her Step 4 analysis.  *See, e.g., Wilson v. Astrue,* 602 F.3d 1136, 1141 (10th Cir. 2010) ("the ALJ . . . did take that disorder diagnosis into account.  He simply determined that the diagnosis did not affect Ms. Wilson's level of functionality."); *Rabon v. Astrue,* 464 F. App'x 732, 733-34 (10th Cir. 2012) ("The mere

diagnosis of [a medical condition], of course, says nothing about the severity of the condition."). Accordingly, the Court finds this argument waived or, alternatively, without merit.

Plaintiff's final contention raises a much more difficult issue, and one with which the Court has struggled.  At page 4 of her decision, ALJ Ferris stated that "[w]ith regard to concentration, persistence or pace, the claimant has moderate difficulties."  *Record* at 14. Indeed, Dr. Padilla found "moderate" deficiencies in concentration/persistence/pace ("CPP"). Plaintiff argues that ALJ Farris' omission of this limitation from her RFC finding and hypothetical question to the VE constitutes error.  The Court recognizes that both the ALJ's decision and the Commissioner's response could be read as pointedly avoiding the moderate CPP designations by Dr. Padilla and Dr. Mohney.  However, the Commissioner does concede that Dr. Mohney concluded Plaintiff suffered moderate limitations in CPP.  *See Doc. 20* at 7.

From a review of the entirety of the ALJ's opinion and the hearing, the Court finds that ALJ Farris' RFC and hypothetical did in fact encompass Plaintiff's moderate CPP limitation by restricting him to "simple, routine tasks" and exempting him wholesale from having to work "at a production pace."  *See Record* at 15.  The regulations define "'[c]oncentration, persistence, or pace'" as "'refer[ring] to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.'"  *Stokes v. Astrue,* 274 F. App'x 675, 680 (10th Cir. 2009) (quoting 20 C.F.R. pt. 404, subpt. P., App. 1, § 12.00(C)(3)); *see also Bowers v. Astrue,* 271 F. App'x 731, 733 n.2 (10th Cir. 2008) (same); *Swanson v. Barnhart,* 190 F. App'x 655, 658 n.1 (10th Cir. 2006) (same); *Seagroves v. Astrue,* CIV 09-1182 WPL (Doc. 20 at 11) (same).  As is clear from the discussion with the VE at the end of the hearing, the ALJ imposed this limitation due to a concern with Plaintiff's ability to perform jobs that required focused and sustained attention.

-10-

Plaintiff disagrees and cites to three decisions – *Chapo v. Astrue,* 682 F.3d 1285, n. 3 (10th Cir. 2012); *Wiederholt v. Barnhart,* 121 F. App'x 833, 383 (10th Cir. 2005); *Chambers v. Barnhart,* No. 03-7007, 2003 WL 22512073 (10th Cir. 2003).  As best the Court understands, Plaintiff relies on these decisions for the broad proposition that imposing a limitation of simple and routine tasks will not suffice to encompass a moderate CPP limitation.  *See Doc. 19* at 4-5. The Commissioner does not directly address the legal argument Plaintiff is making, or the factual consideration whether the ALJ included and submitted that limitation to the VE.  It is apparent from the Court's research that some ALJ's conflate a moderate CPP impairment with a "simple and routine" limitation.[3]

*Wiederholt* comes closest to the legal principle that Plaintiff is asking the Court to employ.  There, the ALJ's RFC finding included a limitation to "simple, unskilled job tasks" due to the claimant's mental limitations, as well as "moderate difficulties in maintaining concentration, persistence, or pace."  *Wiederholt,* 121 F. App'x at 839.  The *Wiederholt* decision can be read as holding that the "simple and unskilled" limitation and the moderate concentration problems inquiry are mutually exclusive:

> The relatively broad, unspecified nature of the description "simple" and "unskilled" does not adequately incorporate the ALJ's additional, more specific findings regarding Mrs. Wiederholt's mental impairments.  Because the ALJ omitted,

---

[3]  *See Weigel v. Astrue,* 425 F. App'x 706, 707-08 (10th Cir. 2011) (ALJ found claimant "had only mild restriction in the activities of daily living; had moderate difficulties in social functioning and with concentration, persistence, or pace; and . . . could perform a full range of work limited to simple work . . . [claimant] argues that the ALJ failed to assess properly her RFC, because the ALJ failed to . . . address how the simple-work restriction encompassed his finding of moderate deficiencies in concentration, persistence, or pace"); *Trujillo v. Astrue,* 241 F. App'x 526, 528 (10th Cir. 2007) ("the ALJ found that . . . detailed and complex work tasks are likely beyond [claimant's] capabilities [and the ALJ's] ultimate conclusion was that [claimant] suffers from moderate limitations in concentration, persistence and pace, and . . . therefore included within his residual functional capacity . . . assessment a restriction to occupations which involve simple repetitive work tasks") (internal quotations omitted).

> without explanation, impairments that he found to exist, ***such as moderate difficulties maintaining concentration, persistence, or pace,*** the resulting hypothetical question was flawed.

*Id.* (emphasis added). Though *Wiederholt* is a 2005 decision, it is notable for the absence any subsequent citation by the Tenth Circuit to this statement, or to the head note that accompanies this statement.

Magistrate Judge Lynch in this District, however, has considered *Wiederholt* persuasive "in the absence of any published opinion from the Tenth Circuit on this issue," and in light of other Circuit decisions that "have reached similar conclusions in published cases." *Seagroves, supra,* (Doc. 20 at 10). In *Seagroves*, Judge Lynch held that a limitation "to simple, unskilled instructions and tasks," *id.* at 8, "fail[ed] to account for Seagroves's moderate difficulties in concentration, persistence, or pace in the RFC or to incorporate the finding into the hypothetical." *Id.* at 11.

Judge Lynch did not, however, discuss the Tenth Circuit's unpublished 2003 disposition in *Chambers* which recognized that "restricting a claimant to simple tasks can address a deficiency in concentration, persistence and pace *if* that deficiency ***was found to apply only to complex tasks***." *Chambers,* 2003 WL at *3, n.2 (emphasis in original) (citing *Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir. 2001), and *Black v. Apfel,* No. 97-5044, 1997 WL 767519 (10th Cir. Dec. 11, 1997)); *also, e.g., Ponce v. Astrue,* No. 4:10CV3188, 2011 WL 5523825, at *20, n.20 (D. Neb. Nov. 14, 2011) (noting *Chambers* emphasizes this point and discussing *Howard*). That is the very situation here. Unlike the *Seagroves* case, the record here amply demonstrates that complex tasks are not a possibility for this particular claimant.[4]

---

[4]   The ALJ in *Chambers **failed*** to properly conduct the PRT analysis, and so "he never made" the finding that a concentration "deficiency was found to apply to only complex tasks." *Chambers,* 2003 WL at *3, n.2 (emphasis omitted). Likewise, though the footnote in *Chapo* questions whether the "vague

Although Dr. Padilla and Dr. Mohney's highlighted findings reflect agreement that Plaintiff has moderate CPP limitations with problems with memory and concentration, *see Record* at 14, Dr. Mohney found Plaintiff "not significantly limited" in areas that involved "short and simple instructions," or the "ability to make simple work-related decisions," or the ability to "ask simple questions or request assistance." *Id.* at 352-53 (emphasis added).  Dr. Mohney instead determined that it was Plaintiff's ability to understand, remember, and carry out "detailed instructions" that posed significant limitations for him.  *Id.* at 252.  Thus, in context, it is apparent that ALJ Ferris implicitly found the CPP limitations applicable to complex, rather than simple, tasks.  Indeed, if their "moderate" CPP limitation was interpreted to apply to their simple tasks findings, then their opinions referred to above would make no sense.

Wherefore,

---

catch-all" phrase "simple work . . . ***would have been sufficient to capture*** the various functionally distinct mental limitations recognized by Dr. Vega," that panel did not universally condemn the practice and did not need to decide the issue given the posture of the case.  682 F.3d at 1290, n.3 (emphasis added).  The ALJ there erred in the first instance in rejecting the doctor's various restrictions, and also failed to cite his "simple" restriction in the hypothetical to the VE.  These decisions are thus distinguishable and afford Plaintiff no basis for remand.  And, regardless of the precedential value of *Wiederholt* in light of the state of Tenth Circuit decisions on the issue, it is not controlling given the Court's conclusion that Plaintiff's CPP limitations were included in the ALJ's RFC conclusion and hypothetical to the VE.  *See, e.g, Bustos v. Astrue,* CIV 10-990 LAM (Doc. 19 at 12) ("While Plaintiff relies on *Wiederholt v. Barnhart* for her claim that the ALJ should have included her mental impairments in his RFC finding, that case is distinguishable because the ALJ in *Wiederholt* failed to describe the claimant's mental limitations in his hypothetical to the VE, which is not the case here.").

In *Black,* the panel found "no reason to disturb the ALJ's findings regarding plaintiff's mental impairment."  *Black,* 1997 WL at *1.  It rejected the argument that a "need for simple tasks and isolation from the general public" limitation was inadequate for a claimant who "often" had "deficiencies of concentration, persistence, or pace," because the argument did not distinguish between tasks of different complexities.  *Id; see also Swanson v. Barnhart,* 190 F. App'x 655, 658 n.1 (10th Cir. 2006) (ALJ did not specifically mention moderate concentration limitations in the hypothetical to the VE, however, "the ALJ adequately accounted for Swanson's CPP difficulties by including within the hypothetical 'marked restrictions in the ability to understand, remember and carry out detailed instructions' and the ability 'to perform simple, but not complex tasks under routine supervision.").

**IT IS HEREBY ORDERED** that Plaintiff's motion to remand *(Doc. 19)* is DENIED,

the decision of the Commissioner is affirmed, and this action is DISMISSED with prejudice.

**IT IS FURTHER ORDERED** that a final order enter concurrently herewith.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE